Good morning, Your Honor. I appeal on behalf of Appellant Ralph Miller in this case. And you are Mr. Miller? No. No, you're not, obviously. I'm sorry, Mr. — I thought Mr. Miller was — I'm sorry, you're Mr. — My name is Henry Deakam. Is it — how do I pronounce it, Mr. Deakam? Deakam. Deakam. Okay. So we're appealing on three separate issues. First of all, jurisdiction over World Trade Corporation, IBM World Trade Corporation. Secondly, the failure to state a cause of action, allegedly, against IBM. And thirdly, the dismissal of IBM China and ECC in this case. Mr. Deakam, I'm having trouble hearing. Is it possible to speak up just a little bit? Yes, ma'am. Thank you. First of all, on the question of jurisdiction over World Trade Corporation, we contend that there was a waiver by IBM World Trade Corporation because they showed up twice to argue substantive matters in court, and they won on those issues. And it's actually a very simple point on that because, in effect, we're saying that because they appeared as volunteers, they don't even have to be drafted. But we rely also on the Bergman Declaration to some extent because the Bergman Declaration was wrong about there not having been shares issued. And if the issuing of almost a million shares is in substantial contact with the state of California, I don't know what is. We also rely on the Hirsch case, which actually was cited by defendants. And the defendants claimed that that supported them. Actually, it supports us because the court there found that there was specific jurisdiction on much more tenuous facts than we have here. That was a case where Blue Cross of Kansas was not licensed to do business in California, paid no state income taxes, didn't solicit any business, and yet they still were found to be liable to be subject to the jurisdiction of this court. Furthermore, World Trade Corporation, we attended meetings with Best of China staff in California. And that appears from page 336 of the appendix, which is a declaration of Mr. Ralph Miller. And we also rely upon the fact that the ETC company had to attend system design sessions at BCC premises. And that appears on page 81. And that's more or less all I have on the jurisdiction issue. Well, the question of failure to state the cause of action, if there's one case that I want to print up in big red letters, it is the case of Sterling v. Taylor. Because that was a case which held that it doesn't matter if a party did not sign a contract so long as it was signed on his behalf, and he's still a party to a contract. Because in the court below, much is made of the fact that IBM did not sign certain contracts like the services contract or the SOW, the statement of work. And that is actually irrelevant to the decision, because provided we can show at trial that it was signed on their behalf by others, they should still be liable on that contract. And that is why we constantly kept saying that defendants, plural, were liable for this or that on each of these causes of action, because they all were working hand in glove with each other. Mr. Deacon, since your time is moving rapidly, on the contract issue, could you point to me any language in any of the contract documents that shows that IBM contracted to provide any goods as opposed to services to BCC? Where is there any language in any of the contracts that there was a suggestion for an agreement for anything besides services? There is a memorandum of agreement which says that. It's, I believe, in Volume 1 of the appendix. It's a single-page document. It's between IBM China and the plaintiff. But we contend that IBM China is acting as agent, based on the Bergman Declaration. I'm sorry, could you say again what you just said? You contend that and then I'm... IBM China was acting as agent for IBM. Okay. And actually it's at page 108, Your Honor. 180? 108, 108. 108. And it says, under Paragraph 1, Technology, IBM will supply BCC with hardware and software systems, including web development tools, database management, billing and auditing processes, and internal management systems, and so on. It specifically calls for provision of hardware to BCC. It's a single-page document. Thank you. And as the Bergman Declaration says, the subsidiaries of IBM World Trade Corporation were all acting for IBM itself. All right, thank you. I will refer to my record. On the question of consideration, the problem there was that BCC discovered that the system was defective only after they signed the amended agreement. And that's why they signed the amended agreement. There is no waiver of claims unknown in the amended agreement. And furthermore, we've alleged fraud in the inception. So for both of those reasons, we think that it should be possible for us to get around the consideration issue. Fraud claims, we contend that we have met the Glenn-Fed standards. Our technician has showed up to help us perhaps make it louder. Yeah. That might help. So if you don't mind interrupting for just a moment while we work with the sound. OK. Your time is running, but it's not really running. I'm pleased to hear that, Joanna. Much better. Much better. I think there's one on this side, too. Pardon me. Thank you. Now, would you do a testing, testing? Testing, testing. Oh, this is better. Thank you. OK, thank you. We could hear you before, but this will make it easier on you, I think, and way easier on us. OK. And that is actually all I have to say on the question of... OK. OK. OK. ...failure to state the cause of action. Yes. The third issue is whether we served IBM China and IBM ECC properly. And there is a Hague Convention certificate which says that IBM ECC was served on 22nd August 2002, which was before the dismissal of the First Amendment complaint and also before the filing of the Second Amendment complaint. And that is at page 491 on the appendix. Right. And IBM China was also served on September the 9th, 2002, and there is a certificate for that, and that is at page 483, I believe. Page 43? 483. 483. 483. OK. Thank you. Now, there is no time limit for service under the Hague Convention, and the lower court actually specifically held that, that Rule 4 does not apply to the Hague Convention service. And despite that, the court didn't give any advance warning. It was going to dismiss for failure to serve those two parties. We did succeed in serving them. Unfortunately, there was also a dismissal of the First Amendment complaint thereafter, and as a result, the court believed that we had not been diligent in pursuing service. All right. OK. But we contend that there should have been warning given that the court was going to do this, because that's what the cases say the court should do. And finally, there is a non-issue in front of you of the panel, which is whether there was a valid assignment or not. The appellees have raised this issue in their brief, but they did not cross-appeal, and because they did not cross-appeal, that issue isn't, in fact, in front of you. But if we need to argue that point, we rely on the case of Trubowitz, 30 Cal 2nd, 335, which holds expressly that an assignment just of claims under contract is not defeated by an anti-assignment clause, because it's just the claims. This isn't OK. At this point, why don't we hear from the other side? You've run over a little bit, but we'll give you some time to respond. Thank you, Your Honor. Thank you. Lonnie. May it please the Court, My name is Loren Kiva. I'm with the firm of Quinn Emanuel Urquhart Oliver & Hedges, and I represent You can speak up. Sorry. And I represent International Business Machines Corporation and IBM World Trade Corporation, otherwise known as WTC in this case. One minor housekeeping detail, if I could, Your Honor. In Mr. Miller's reply brief at page 16, he indicates that, quote, IBM also asserts that because the contract exceeded $500, it could not be simply oral because of the statute of frauds provisions of the UCC. I'm sorry. Help me out here. I'm on page 16, and now start over with what you said. It took me a minute to get here. I'm sorry. Yeah. Mr. Miller's reply brief. Yes, I'm with you. First full paragraph. Yes. IBM also asserts that because the contract exceeded $500, it could not be simply oral because the statute of frauds provisions of the UCC. IBM never raised this below. Yes. I respectfully refer to the Court to our notice of motion and memorandum of support filed on February 7 at page 17. Now, is that in the excerpts? It's not, because according to this Court's procedures, you don't put briefs in the excerpts, but it's in the record. It's in the record. Okay. Judge Nelson asked Mr. Miller's counsel, could you please tell us where in this record you will find a contract that said that IBM agreed to provide anything other than services? First of all, IBM itself, the defendant in this case that's on appeal, never agreed to provide anything in the form of services or anything else. If you take a look at the document that Mr. Miller's counsel referred you to on page 108 of the appendix of record, you will see that this memorandum of agreement is between Best of China.com, Inc., and IBM China Company Limited, which is then defined as IBM. That document, as it reflects, was signed in Shanghai, People's Republic of China. There is nothing in this record. I submit an answer to Judge Nelson's question that suggests that IBM itself agreed to provide any form of hardware. With respect to the issue of IBM WTC, I think the record is also uncontroverted and fully supports Judge Schenken's decision that WTC is not subject to jurisdiction in the State of California. It did no business here. It provided no services here. It's never been sued before here. All that it did was sign an original subscription agreement, which was then superseded by the amended subscription agreement. All the agreements were signed either in New York or in China, and we would respectfully suggest that Judge Schenken's decision on that point should be upheld. With respect to the other issues, I'll go backward if I can. The issue of service of the second amended complaint on the two, what I refer to as China and ETC, the record, we believe, Your Honors, is also quite clear, that the first amended complaint was dismissed. Actually, both the first and the second complaints were dismissed for lack of standing. The first complaint, quite clearly, was dismissed by Judge Schenken's, not only the complaint but the action, and that's what he said. And you can find that in his first order, quote, So by the time that Mr. Miller finally got around to serving his second amended complaints, which he claims, although I don't read Mandarin, I'm not sure the court does either, but the documents he submitted appear to be in Chinese, he claims that ETC was served on August 22, 2002, and IBM China was served on September 9. Even if those documents turn out to be what Mr. Miller suggests, ETC would have had 20 days to reply until September 11, five days earlier, Judge Schenken's had already dismissed the action. Five days earlier than what? Than the time on which ETC would have had to have filed an answer to the complaint. So as of the time its answer was due, there was no action, period. The same holds true. But I don't know. How does that help you? That is to say, if the district judge dismisses before an answer is due, but nonetheless service was proper, that sounds like an error by the district judge. No. Service of the first amended complaint, which was dismissed for lack of standing. Therefore, there was no action, quote, unquote, pending at the time. There was no operative document to which IBM China would have had to have responded at the time. And I think the cases are quite clear on that. But what was then, I understand you contest service, but assuming service was made, what was then served at that later time? There was only one document that was actually ever served on the two Chinese entities, and that was the, quote, original complaint. Judge Jenkins, at the time, the response was due for both of those, for either IBM China or IBM ETC. There was no operative action pending. And therefore, they had to. Because that original complaint had been dismissed for lack of standing. Exactly. So they didn't have to file an answer. Correct. And as Judge Jenkins, we believe. And it was dismissed before service? It was dismissed in one case before service, in one case after service, but before  And it was dismissed for lack of standing, not for lack of service? For lack of standing. Yes. We believe that Judge Jenkins did not abuse his discretion when he determined that after waiting seven months, Mr. Miller never got around to serving the second amended complaint. Never got around or never initiated any effort to do so. As far as the record is concerned, never initiated any effort to do so, Your Honor. Because they had to go through a fairly complicated process to serve in a foreign country, don't you? You have to have it translated into Chinese. You then have to give it to the central authority in China, which is in Beijing, and then it has to be served on the appropriate defendant. It's clear that Mr. Miller knew how to do that because he tried to do it the first time and didn't do it successfully. Well, how did he affect service? You said there was proper service at some point. He claims, although, as I say, the documents are in Mandarin Chinese and he did not apply the lower court or this Court with a translation. He claims it was done through the effective Chinese ministry. I don't know that for a fact. And do you agree with the legal contention that there is no time limit contained in the Hague Convention for when service must be made and the implicit further proposition that there's nothing in Rule 4 that sets a shorter time period if it's being served in accordance with the Hague Convention on the central – through the central authority? Actually, if you now analyze it, Your Honor, I think Mr. Miller's position would be even stronger because Rule 4 specifically exempts service under the Hague Convention from the 120 time – time day limit. But at the same time, Rule 41 certainly still applies in terms of prosecuting an action with due diligence, and that's the standard upon which we believe Judge Jenkins dismissed this action, because having waited seven months before even attempting service, we think that that was well within Judge Jenkins' discretion to dismiss this case for lack of prosecution. But the argument is not that he was required to serve within that time. No. With respect to the basic issues, I think they're quite clear. I've addressed lack of jurisdiction over WTC. Judge Jenkins understandably gave Mr. Miller three bites at the apple to try and frame a proper complaint. The second time he failed to properly do so, Judge Jenkins essentially gave him a roadmap. And – Would you – excuse me. Would you comment on the district judge's conclusion that Mr. Miller did not adequately plead alternative liability even under the lower Rule 8 pleading standards? When you say alternative, are you talking about alter ego? Yes. Adventure and agency? Yes. I think Judge Jenkins' decision was absolutely correct. If you take a look at what the allegations were, to allege agency, you've got to allege authorization and actual agency. There's nothing in these documents that indicates that IBM was acting as anything other than an independent entity. The sole basis of all of this is the fact that there was no alter ego in this case. Do we get to that on a motion to dismiss?  I mean, to state a cause of action for any one of those three, what I'll call vicarious liabilities or alter ego type of liability, you have to allege the elements. And those elements were simply – Why do you have to allege the elements under Rule 8a? I was raised on the sort of the notice theory of Rule 8a under Judge Clark. So long as you're on notice of the nature of the claim, that's enough. I don't believe so, Your Honor. And I think – I don't have the – Your authority is? If you'll give me a moment. Let's try Hackema v. E.F. Hutton, 566 F. Sup. 636, cited in our brief at page 27. And that's a decision by? Central District of California. I don't have a decision from this Court, but I'm sure I can supply one to Your Honor. Well, it – I'm not going to prejudge this case on this point, but I will say that there has been a tendency repeatedly by the lower Federal courts, both district and courts of appeal, to require heightened pleading standards beyond what's required under Rule 8a. And from time to time, the Supreme Court steps in and says, you know, read Rule 8a. They've done it twice in the last 15 years. I believe, Your Honor, I see my time has expired. But in answer to your question, I think it's quite clear that you can't simply say John Doe is my agent. You have to lay out elements by which you can infer, as a matter of fact. I think notice pleading does not give you that kind of carte blanche. My time has expired. Unless the Court has any further questions, I'd like to thank you for your criticism. Okay. Thank you. Thank you very much. Mr. Deacon, if you wish to respond, we will certainly give you time to do so. Take your time. We're not in a hurry. Your Honor, first of all, the question is a question of the memorandum of agreement at page 108. I'm there. Counsel has just argued that it's a contract that stands in isolation. It does not. It is specifically tied to the whole matrix of contracts. And at the bottom paragraph, it says, in consideration of this agreement, BCC shall issue equity shares in BestofChina.com, a California corporation, to IBM World Trade Corporation. In other words, they were simply fulfilling the requirements of the original agreement that was signed between IBM World Trade Corporation and BCC. And it's quite clear it does not stand in isolation, this memorandum of agreement. It is part and parcel of being an agent for IBM World Trade Corporation, which in turn acted as agent for IBM. And I'd like to refer your Honor back to the Bergman Declaration. There's a copy in Volume 3. It's easy to find because it's the very first document. And the second paragraph, page 565, states, amongst other things, WTC is a wholly owned subsidiary of the International Business Machine Corporation. Here and after IBM. WTC is incorporated in Delaware and has its principal place of business in New York. Through its subsidiaries, WTC conducts IBM's business activities outside the United States, using information technology, etc. And when someone declares that, through its subsidiaries, WTC conducts IBM's business activities, I take that to mean that they are an agent, that WTC is an agent. And that in turn, the subsidiaries are agents, too, of IBM itself. I understand the argument. And then I'd like to turn to the question of the dismissal. The dismissal of the First Amendment complaint. That dismissal was only as to IBM and IBM World Trade Corporation. It had to be that because ETC hadn't yet shown up and IBM China hadn't shown up either. And the court in its final order of May 2003 specifically said that the filing of an amended complaint renders void any previous complaints. Now that is correct, but it means that service that took place before the dismissal and the filing of an amended complaint should still be valid, regardless of the fact that the complaint was then replaced by another complaint later on. All right. Thank you very much. Thank both sides for a useful argument in a complex case. The case of Miller v. International Business Machines is now submitted for decision. The next case on the argument calendar is Foe v. Ashcroft. Thank you.
judges: D.W. Nelson, W. Fletcher, Fisher